IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE

STATE OF TENNESSEE

COUNTY OF SHELBY

Case No. 23-SW-270

## ATTACHMENT C
## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, **Keyotta Sanford**, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the FBI assigned to the Memphis Division and have been a Special Agent since January 2019. I am currently assigned to the Child Exploitation & Human Trafficking Task Force, investigating matters involving the sexual exploitation of children, human trafficking, and child sexual abuse material (CSAM). I have participated in various trainings and investigations involving online and computer related offenses and have executed numerous search warrants, including those involving searches and seizure of computers, digital media and electronically stored information.

2. I make this affidavit in support of an application for a search warrant for information associated with certain Snap, Inc. accounts associated with the identifiers, **"Justinp9131"** and **"Justinstough22"**, which are stored at premises controlled by Snap, Inc., which is an electronic communications and remote computing service provider headquartered at 2772 Donald Douglas Loop North, Santa Monica, CA 90405. The information to be searched is described in the following paragraphs and in **Attachment A**. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Snap, Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of **Attachment B**. Upon receipt of the information described in Section I of **Attachment B**, government-authorized persons will review that information to locate the items described in Section II of **Attachment B**.

1



3. Based on my training and experience, and facts as set forth in this affidavit, there is probable cause to believe that items which constitute instrumentalities, fruits, and evidence of violations of 18 U.S.C. § 2251(a) (production/attempted of child pornography) and 18 U.S.C. § 1201 (kidnapping) are contained within information associated within the Snap, Inc. identifiers "**Justinp9131**" and **"Justinstough22"** (hereby by known as the "Snapchat Accounts"), which is described more fully in **Attachment A**.

4. The following information was obtained through observations and conversations of your affiant personally, through the assistance of other law enforcement agents and agencies, including their reports, and through other sources specifically named in this affidavit. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence of violations of 18 U.S.C. §§ 2251(a) and 1201 will be located at the premises described in **Attachment A**, and consist of or be contained in the items listed in **Attachment B**, both of which are incorporated by reference as if fully set forth herein.

## APPLICABLE STATUTES AND DEFINITIONS

5. As noted above, this investigation concerns alleged violations of the following:

   a. 18 U.S.C. §§ 2251(a) makes it a federal offense for anyone to knowingly employ, use, persuade, induce, entice, or coerce any minor to engage in sexually explicit conduct as defined in 18 U.S.C. §§ 2256, for the purpose of producing a visual depiction of such conduct, or attempts to do so.

   b. 18 U.S.C. §§ 1201 makes it illegal to unlawfully seize, kidnap, or carry away and hold for ransom or reward or otherwise any person, including when the victim of the offense has not attained the age of eighteen years and the offender is an adult that is not related or has legal custody of the victim, travels in interstate or foreign commerce or uses any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense, or attempts to do so.

6. The following definitions apply to this affidavit and Attachment B.

KJ
6/14/2023

a. The term "minor," as used herein, is defined pursuant to Title 18 U.S.C. §2256(1) as "any person under the age of eighteen years."

b. As it is used in 18 U.S.C. § 2252, the term "sexually explicit conduct" is defined in 18 U.S.C. § 2256(2)(A), and includes sexual intercourse of any kind, whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; and the lascivious exhibition of genital or pubic area.

c. As it is used in 18 U.S.C. § 2252A(a)(2), the term "child pornography" is defined in 18 U.S.C. § 2256(8), and includes any visual depiction, including any photograph, film, video, picture, or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where: (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in "sexually explicit conduct".

d. The term "sexually explicit conduct" has the same meaning in § 2252A as in §2252, except that for the definition of child pornography contained in § 2256(8)(B), "sexually explicit conduct" also has the meaning contained in § 2256(2)(B), to include (a) graphic sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex, or lascivious simulated sexual intercourse where the genitals, breast, or pubic area of any person is exhibited; (b) graphic or lascivious simulated; (i) bestiality; (ii) masturbation; (iii) sadistic or masochistic abuse; or (c) graphic or simulated lascivious exhibition of the genitals or pubic area of any person.

e. The term "graphic," as used in the definition of sexually explicit conduct contained in 18 U.S.C. § 2256(2)(B), is defined pursuant to 18 U.S.C. § 2256(10) to mean "that a viewer can observe any part of the genitals or pubic area of any depicted person or animal during any part of the time that the sexually explicit conduct is being depicted."

3

KS
6/14/2023

f.     The term "visual depiction," as used herein, is defined pursuant to Title 18 U.S.C. § 2256(5) to include "undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into a visual image."

g.     The term "producing," as used herein, is defined pursuant to Title 18 U.S.C. §2256(3) to include "producing, directing, manufacturing, issuing, publishing, or advertising".

h.     The term "computer" is defined in Title 18 U.S.C. § 1030(e)(I) as an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

i.     The term "Internet", as used herein, refers to the global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices' communication with each other are in the same state.

j.     The term "Internet Protocol address", as used herein, refers to a unique number used by an Internet accessible device, which is used to access the Internet. IP addresses are assigned by "Internet Service Providers" or "ISPs", which are commercial organizations that provide a range of functions for their customers including access to the Internet, web hosting, email, and remote storage.

k.     The term "electronic communication service" is defined in Title 18 U.S.C. §2510(15) as any service which provides to users thereof the ability to send or receive wire or "electronic communications", which refer to any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photo-electronic or photo-optical system that affects interstate or foreign commerce.

l.     The term "electronic storage" as defined in Title 18 U.S.C. § 2510 (17) means any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and any storage of such

*KS*
*6/14/2023*

communication by an "electronic communication service" for purposes of backup protection of such communication.

  m. The term "electronic device", as used herein, is defined as any portable, electrical powered device capable of sending or receiving a wireless signal; storing, sending, or retrieving electronic data; or having computing capability.

  n. The term "chat/chat group", as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally shorter, resembling an oral conversation, and are distinguished from other text-based online communications such as Internet forums and email.

## CHARACTERISTICS OF INDIVIDUALS WHO ACCESS WITH INTENT TO VIEW, PRODUCE, RECEIVE AND POSSESS CHILD PORNOGRAPHY

7. Based on my knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, there are certain characteristics that are prevalent among individuals who are involved in the production and receipt of child pornography:

  a. The majority of individuals who produce and receive child pornography are persons who have a sexual attraction to children, and may engage in the sexual abuse of children or exchange and collect child pornography and child erotica to receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature and communications about such activity.

  b. Individuals who produce and receive child pornography may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videos, drawings or other visual media. Not only do these individuals oftentimes use these materials for their own sexual arousal and gratification, but they also may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

KS
6/14/2023

  c. The majority of individuals who collect, receive and produce child pornography often seek out like-minded individuals, either in person or via the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance, and support. Individuals who collect and produce child pornography often correspond with and/or meet others to share information and materials and often maintain lists of names, usernames, addresses, emails, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography and child sexual abuse.

  d. Persons committing these criminal acts, more likely than not, almost always possess and maintain their hard copy and/or digital medium collections of child pornographic and child erotica material in a secure and private environment. Due to the psychological support their collections provide, such individuals find comfort and justification for their illicit behavior and desires and rarely destroy such materials. As such, these collections are often maintained for several years and are kept close by, usually in a location that is mobile and/or easily accessible to the individual.

  e. In some cases, people who have a sexual interest in children have been found to download, view, then delete child pornography on a cyclical and repetitive basis, and to regularly delete any communications about the sexual abuse of children rather than storing such evidence on their computers of digital devices. Traces of such activity can often be found on computers or digital devices for months or even years after any downloaded files have been deleted.

  f. Individuals that receive and collector child pornography frequently prefer not to be without their child pornography for any prolonged time period, and more likely than not may go to great lengths to conceal and protect their collection of illicit materials from discovery, theft, and damage. This behavior has been documented by law enforcement officers involved in child exploitation and pornography investigations worldwide.

## BACKGROUD REGARDING ELECTRONIC DEVICES AND THE INTERNET

  8. Based on my knowledge, training, and experience investigating crimes involving the online sexual exploitation of children, I know the following:

*KS 6/14/2023*

a. Computing technology has not only changed the way in which children are exploited in the production, collection, storage and distribution of child pornography and child erotica materials, but also in how individuals who sexual exploit children interact with one another.

b. Advancements in technology, to include accessibility to the Internet, have made it easier for individuals to communicate, produce, store, and distribute child pornography and child erotica in a manner that is inexpensive and relatively anonymous. Internet connected devices, such as computers and smart phones, provide collectors of child pornography with different venues for obtaining, viewing, and trading child pornography and child erotica.

c. In particular, a computer is ideal for storing large quantities of digital media and is an ideal repository for child pornography. Communications by way of computer can be saved and stored intentionally or unintentionally. In addition to electronic communications, a computer user's activities (such as Internet browsing or utilization of peer to peer software) leave traces that can be recovered via a forensic examination.

d. Individuals who collect child pornography may also utilize various forms of portable electronic storage media that, more likely than not, are used on Internet connected devices and/or other forms of electronic storage media, such as external hard drives, flash drives, and USB thumb drives, which can store hundreds of thousands of digital media. Portable electronic storage media are typically utilized by collectors of child pornography due to increased storage capacity, ease of concealment, and the ability to encrypt illicit materials.

e. Cell phones and "smart phones" function similarly to computers and have been used to send, receive, store, and produce media depicting child pornography, as well as engage in voice, email, text, and real time chat conversations with minors and others. Mobile devices can also contain secure digital (SD) cards and/or subscriber identity module (SIM) cards which can be used to store data such as pictures, videos, text messages, contact lists, call logs and other data.

f. Individuals who produce and collect child pornography, more likely than not, use online resources such as companies that provide electronic communication and "cloud based" services to retrieve and store child pornography and child erotica.

*KJ*
*6/14/2023*

Electronic communication service providers, such as Gmail, Apple, Microsoft, and Dropbox among others, can be utilized for online storage which can be accessed from any Internet connected device, such as a computer or mobile phone. Even in cases when online storage is used, evidence of child pornography can be found on the user's electronic devices in most cases.

## INVESTIGATION

9. On March 20, 2023, the FBI Memphis Child Exploitation and Human Trafficking Task Force was contacted by the Lauderdale County Sheriff's Office (LCSO) regarding allegations a 13 year-old female had been kidnapped and sexually assaulted by a registered sex offender, identified as Austin Pridmore. LCSO further advised Pridmore had been identified in a similar kidnapping and sexual assault of another minor female approximately a year prior.

10. On March 19, 2023, the LCSO received an out of state phone call from a female who advised her minor friend had been sexually assaulted by an adult male known to her as "Justin Parker". The LCSO responded to the house of the minor female, hereby referred to as VICTIM 1, who told officers she met "Justin Parker" via the messaging application Snapchat. After agreeing to meet up with him, he picked her up in a truck and drove her to an unknown location where she was zip tied and sexually assaulted. Investigators observed markings around the victim's wrist and were shown the Snapchat username "Justinp9131" and a picture from Snapchat of "Justin Parker". When Investigators showed VICTIM 1 a Tennessee driver's license photo and booking photo of the Austin Pridmore (Pridmore), the minor victim identified him as the individual who sexually assaulted her, known as "Justin Parker" via Snapchat.

11. On March 19, 2023, Deputies arrested Pridmore at his residence located 374 Bald Knob Rd, Ripley, TN and identified a 2012 Chevrolet Silverado, Tennessee tag #105BDZY, VIN 1GCRKSE75CZ182880. A check of the Tennessee Motor vehicle registry showed the vehicle was registered to Austin Pridmore. Deputies secured the vehicle and pursuant a state search warrant, seized cut zip-ties, a knife, a shirt, and other items from inside the vehicle.

12. On March 30, 2023, VICTIM 1 was forensically interviewed and advised she had met an individual whom introduced himself to her as an 18 year old male named "Justin Parker" via Snapchat. VICTIM 1 later learned "Justin Parker" was actually a 20 year old male

8



named Austin Pridmore. "Parker" would ask VICTIM 1 to send nude images of herself and would also engage in sexually explicit conversations with her. On the morning of March 19, 2023, VICTIM 1 was contacted by Pridmore and she agreed to meet with him as she was going through a rough period and wanted to talk with him about some of her personal issues. Pridmore picked VICTIM 1 up near her residence in a silver truck. After getting inside his truck, VICTIM 1 observed signs indicating he had been drinking alcohol. When she asked if he had been drinking, Pridmore confirmed he had. Pridmore refused to take VICTIM 1 back to her home and drove her to an unknown field, where he parked his truck. VICTIM 1 was physically assaulted in the passenger front seat of the truck and attempted to resist Pridmore as he used zip ties to restrain her wrists.

13. VICTIM 1 described her sexual assault as painful, particularly when Pridmore penetrated her vagina with his fingers and penis. She was afraid of Pridmore as he had choked her with his hand around her neck to the point she felt she would pass out. After the sexual assault, Pridmore dropped VICTIM 1 down the road from her house. VICTIM 1 further advised she had snuck out to be with Pridmore a few times prior to the sexual assault to engage in sexual activities. She recalled an instance in which he put his iPhone on his mirror while they had sex in his truck and believed it was possible he may have recorded them having sex. While VICTIM 1 had slept with Pridmore in the past, she did not want to have sex with him the last time she met him. VICTIM 1 was afraid to tell her family and confided in friends regarding the sexual assault. In particular, she was fearful that she could have been pregnant as Pridmore had ejaculated inside of her vagina.

14. On or around March 20, 2023, FBI Memphis was notified of other child exploitation investigations involving Pridmore as the subject. One of these investigations identified a possibly Snapchat account used by Pridmore as "Justinstough22". Your affiant searched the Tennessee Sex Offender Registry, which showed Pridmore being assigned offender ID 00638992. Pridmore was on the registry for violations of Tennessee Annotated Code (TCA) 39-13-522 (criminal attempt to commit rape of a child) and 39-15-302II (incest). Furthermore, it appeared Pridmore had been registered as a sex offender at the time of this offense.

15. On or around April 19, 2023, FBI Memphis was provided a copy of the forensic interview of a 14 year old minor female, hereby referred to as VICTIM 2. She disclosed she

KS
6/14/2023

had met an unknown male via Snapchat when she was around 12 or 13 years old. The male advised he was someone that knew her brother and was 18 years old. While she could not recall the alias he used on Snapchat at the time, she later learned his real name was Austin Pridmore. Pridmore had asked her to hang out and drove to her grandmother's house. Once she got into his vehicle he locked the doors and proceeded to sexually assault her. VICTIM 2 described the forced penile/vagina sex as painful, with burning in and around her crotch. After he ejaculated inside of her, he let her out of the vehicle.

16. A subpoena was sent to Snap, Inc. seeking subscriber information associated with the Snapchat account "Justinp9131" between the dates of March 1, 2023 and March 30, 2023. On April 3, 2023, Snap, Inc. provided the following subscriber information and IP address logs:

| Snapchat IP | Justinp9131 |
|---|---|
| Display Name | Justin Parker |
| Email Address | Austonpridmore2276@icloud.com |
| Phone Number | 731-635-3678 |
| Account Created | 12/1/2022 14:14:51 (UTC) |
| Notable IPs | 107.119.45.24, 172.3.62.74 |
| User_Agent | iPhone; iOS |

17. A subpoena was sent to Snap, Inc. seeking subscriber information associated with the Snapchat account "Justinstough22" between the dates of March 1, 2023 and March 30, 2023. On May 20, 2023, Snap, Inc. provided the following subscriber information and IP address logs:

| Snapchat Username | Justinstough22 |
|---|---|
| Display Name | Justin Stough |
| Email Address | Placerj85@gmail.com |
| Phone Number | NA |
| Account Created | Mon Aug 22 00:15:40 UTC 2022 |

KS
6/14/2023

| Notable IPs on 3/19/2023 | 107.119.45.24, 172.3.62.74 |

18. An open source "who-is" search was conducted for the IP address 107.119.45.24, which was provided by Snap, Inc. as being used to access the Snapchat Accounts on the date of the criminal offence. The IP address was registered to AT&T Wireless for assignment to their mobile customers. A subpoena was sent to AT&T Wireless seeking subscriber information associated with the phone number 731-635-3678, between the dates of March 1, 2023 and March 29, 2023, which was registered to the Snapchat account username "Justinp9131". On April 4, 2023, AT&T identified the following subscriber information:

| Name | Janie & Kenneth Pridmore |
|---|---|
| Billing Address | 374 Bald Knob Rd, Ripley, TN 38063 |
| Customer Since | 11/01/2005 |
| Account Status | Live |

19. An open source "who-is" search was conducted for the IP address 172.3.62.74, which was provided by Snap, Inc. as being used to access the Snapchat Accounts on the date of the criminal offence. The IP address was registered to AT&T U-verse for assignment to their Internet customers. A subpoena was sent to AT&T U-verse seeking subscriber information associated with the IP address 172.3.62.74, between the dates of March 1, 2023 and March 29, 2023. On 4/16/2023, AT&T U-verse provided the following subscriber information:

| Name | Mandy Pridmore |
|---|---|
| Billing/Service Address | 5456 Highway 104 W, Dyersburg, TN 38024 |
| Account Creation | 2022-07-29 |
| Account Status | Open |

20. On or around March 30, 2023, the National Center for Missing and Exploited

KJ
6/14/2023

Children (NCMEC) submitted a Cybertip for the Snapchat username "Justinp9131". The Cybertip advised Snapchat had observed approximately 14 files which were suspected to be possible child exploitation material. The media reported within the Cybertip was human reviewed by Snapchat. NCMEC also reviewed the 14 files and categorized them as B2, which your affiant knows is a category utilized by NCMEC to describe material that consist of pubescent minors with lascivious exhibition of the pubic area (to include anus and genitalia). After requesting to review the files from the FBI Crimes Against Children Human Trafficking Unit (CACHTU), your affiant observed the 14 files previously viewed by NCMEC and confirmed the material did appear to be of underage pubescent females. In some instances their faces, bodies, and vaginal areas were clearly visible.

21. A subpoena was sent to Apple, Inc. seeking subscriber information associated with the email address austonpridmore2276@icloud.com, which was registered with the Snapchat account "Justinp9131", and other identifiers associated with Pridmore between the dates of March 1, 2023 and March 29, 2023. On May 16, 2023, Apple, Inc. identified the following subscriber information:

| **DSID** | **Apple Logon ID** | **Customer Name** |
|---|---|---|
| 20737207788 | Austonpridmore2276@icloud.com | Austin Pridmore |
| 18274650316 | Austinpridmore12821@icloud.com | Austin Pridmore |

22. Open source researched showed Austin Pridmore is a relative of Janie Pridmore, Kenneth Pridmore, and Mandy Pridmore. A review of records from AT&T and Apple showed there were many accounts which appeared to have been registered in the names of Pridmore's relatives, but were utilized by him.

23. Based on the forgoing factual information, your affiant submits there is probable cause to believe that violations of U.S.C. §§ 1201 and 2251(a) have been committed, and evidence, instrumentalities and fruits of those violations are located at the PREMISES further described in **Attachments A and B** of this affidavit.



## INFORMATION REGARDING SNAPCHAT

24. Snapchat is a social networking service owned by Snap, Inc. and headquartered at 2772 Donald Douglas Loop North, Santa Monica, California. Snapchat is an application for sending and receiving messages, pictures and videos that 'self-delete" after they are viewed.

25. A "snap" is a picture or video message taken and shared with other Snapchat users in real-time. Once a snap has been viewed, it is deleted from the company's server and is no longer visible to the recipient. Snapchat users can send direct messages to others using the Chat feature. Once a user leaves the Chat screen, messages viewed by both the sender and the receiver will no longer be visible. The application notifies other users when they are online so they can begin messaging each other. In addition, Snapchat users can send pictures to other users by utilizing the camera on their device. Pictures can also be sent from the saved pictures in the photo gallery of the device. Accessing a Snapchat account and "snaps" constitute "electronic communications".

26. "Our Stories" is a collection of user-submitted "snaps" from different locations and events. Snapchat users, with the location services of their device turned on, can contribute to a collection of snaps regarding the event. For example, multiple different Snapchat users at a party could all contribute to the same "Our Stories" collection by sharing their snaps, even if they do not know each other. Users can also view "Our Stories" events if they are not actually present at the event by subscribing to the story. In addition to "Our Stories", a Snapchat user can keep photo/video diary using the "Story" feature. Each snap in a "Story" documents the user's experience. Based on the user's privacy settings, the photos and videos added to a "Story" can be viewed either by everyone on Snapchat or just the user's friend. Stories are visible to other users for up to 24 hours.

27. While a Snapchat message may disappear, the record of who sent it and when still exists. Snapchat records and retains information that is roughly analogous to the call detail records maintained by telecommunications companies. This includes the date, time, sender, and recipient of a Snap. Additionally, Snapchat stores the number of messages exchanged, which users are communicated with the most, message status including if and when the message was opened, and whether the receivers used the native screen capture function of their device to take a picture of the snap before it disappeared.

KJ
6/14/2023

28. Snapchat asks users to provide basic contact and personal identifying information. When users create an account, they make a unique Snapchat username. This is the name visible to other Snapchat users. An email address is required to register a Snapchat account and a new user must also provide a mobile phone number. This phone number is verified during the registration process. Snapchat sends an activation code which must be entered before proceeding with the registration step. However, users may elect to bypass entering a phone number so one may not always be present in the user's account. Snapchat also retains the account creation date.

29. Snapchat stores device information such as the model, operating system, operation system version, mobile device phone number, and mobile network information of devices used in conjunction with the service. Snapchat also collects unique device identifiers such as the Media Access Control (MAC) address and the International Mobile Equipment Identifier (IMEI) or Mobile Equipment Identifier (MEID) of devices used to access Snapchat. In the event the Snapchat user's application crashes, the company also collects a list of other installed applications on the device to detect any potential software conflicts.

30. Snapchat has a "Group Stories" feature allowing multiple users to contribute photos and videos to the same "Story," a collection of posts that stay viewable for a limited number of times. Snapchatters can name their group story and invite other users and "friends" by username to add content. The Group Stories will disappear if 24 hours pass without a user adding a new photo or video.

31. In some cases, account users will communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Application providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In addition, application providers often have records of the IP addresses used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help identify which computers or other devices were used to access the account.

32. Snapchat allows users to subscribe to its service by using email addresses, phone numbers, and creating a profile name. The users can the post and share photographs and videos

KS
6/14/2023

with other users whom they follow or follow them. Users can also send a direct message to other users and also send photographs or videos directly to another user. The Snapchat application is primarily used on a mobile device, such as an iPhone, Android phone, iPad or tablet.

## JURISDICTION

33. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## CONCLUSION

34. Based on the forgoing factual information, your affiant submits there is probable cause to believe that violations of 18 U.S.C. §§ 2251(a) and 1201 have been committed, and evidence of those violations can be found in the Snapchat Account, stored at premises controlled by Snapchat. Your affiant respectfully requests that the Court issue a search warrant authorizing the search and seizure of items described in **Attachment B** of this Affidavit.

35. This application seeks a warrant to search all responsive records and information under the control of Snap, Inc., a provider subject to the jurisdiction of this court, regardless of where Snap, Inc. has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Snapchat's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

36. Your affiant is aware that many providers of digital services, such as Snap, Inc., have staff members who work shifts other than traditional business hours. Such staff members may at times be responsible for compiling materials responsive to search warrants. Therefore, your affiant requests that this warrant be executable at any time of the day or night, as that may be more convenient for the responding party.

*KS*
*6/14/2023*

37. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

38. In consideration of the foregoing, your affiant respectfully requests that this Court issue a search warrant for the search of the Snapchat Accounts, more specifically described in **Attachment A** which is incorporated by reference as if fully set forth herein, authorizing the seizure and search of the items described in **Attachment B**, incorporated herein.

AND FURTHER, AFFIANT SAITH NOT.

Keyotta Sanford - AFFIANT
Special Agent,
Federal Bureau of Investigation.

Pursuant to Federal Rule of Criminal Procedure 41(d)(3), the undersigned judicial officer has on this date considered information communicated by [x] telephone or [ ] other reliable electronic means or [ ] both, in reviewing and deciding whether to issue a search warrant. In doing so, this judicial officer has placed the affiant under oath and has confirmed by speaking personally with the affiant on the telephone [x] that the signatures on the search warrant application and affidavit are those of the affiant or [ ] that the affiant has authorized the placement of the affiant's signatures on the application and affidavit, the documents received by the judicial officer are a correct and complete copy of the documents submitted by the affiant, and the information contained in the search warrant application and affidavit are true and correct to the best of the affiant's knowledge.

Subscribed and sworn to before me on June 14, 2023.

s/Annie T. Christoff
Honorable Annie T. Christoff
United States Magistrate Judge
Western District of Tennessee

KS
6/14/2023